UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : : : : |
| Plaintiff, | : Civil Action No. 1:12-cv-00285 |
| vs. | : : |
| **MICHAEL A. BAKER AND MICHAEL T. GLUK,** | : : : |
| Defendants, | : : : |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1. This case arises from the failure of Defendants Michael A. Baker ("Baker") and Michael T. Gluk ("Gluk"), the former CEO and CFO of ArthroCare Corporation, to reimburse the company for cash bonuses, incentive and equity-based compensation (collectively, "SOX 304 compensation"), and the profits received from the sales of ArthroCare stock during the 12-month periods following the issuance of ArthroCare's quarterly and annual financial statements later restated, as required by Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

2. During Baker and Gluk's tenure, two ArthroCare sales executives, John Raffle and David Applegate, executed a fraudulent scheme to materially overstate the company's revenues and earnings using a variety of techniques, including channel stuffing, shipments of nonconforming goods at quarter ends, and oral assurances to vendors that collection would not be sought on shipments. As a result of the scheme, ArthroCare restated its financial statements

for the years ended 2006 and 2007 (and the quarters in those years) and the quarter ended March 31, 2008.  The Commission does not allege that Baker and Gluk participated in the wrongful conduct.  Defendants, however, have not reimbursed ArthroCare for the SOX 304 compensation and stock sale profits they received during this time period, as the law requires them to do.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to Section 3(b) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7202(b)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) & 78aa].

4. Venue is proper here because certain of the acts, practices, transactions and courses of business alleged herein occurred within the Western District of Texas.

## DEFENDANTS

5. **Michael A. Baker**, 52, is ArthroCare's former President and CEO.  He served in that role from 1997 through February 2009, when he voluntarily resigned at the conclusion of the company's investigation of certain revenue recognition practices.   He is currently the President and CEO of Pulmonx, Inc., a privately-held company that designs and manufactures medical devices.  Baker lives in Woodside, California.

6. **Michael T. Gluk**, 53, is ArthroCare's former CFO.  He joined the company in 2004, initially serving as the Vice President of Finance and Administration.  On May 11, 2006, he assumed the role of CFO, a position he held until he resigned on December 19, 2008, also in connection with ArthroCare's internal investigation.  Gluk is currently the COO of SpineSmith Partners, LP, a privately-held orthopedic biotech company based in Austin, Texas, where he now resides.

## OTHER RELEVANT PARTIES

7. **ArthroCare Corporation** is a Delaware corporation headquartered in Austin, Texas, that manufactures medical devices. At all relevant times, ArthroCare's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on the NASDAQ under the symbol "ARTC." On February 9, 2011, the Commission issued an order requiring ArthroCare to cease and desist from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder.

8. **DiscoCare Corporation** was a private Delaware corporation created in 2005. Based in Palm Beach, Florida, DiscoCare distributed ArthroCare products (especially spine wands) until December 31, 2007, when it was acquired by ArthroCare. ArthroCare was DiscoCare's only supplier. At various times, DiscoCare was ArthroCare's largest distributor of spine wands.

9. **John Raffle**, age 41, was ArthroCare's former Senior Vice President of Strategic Business Units. ArthroCare terminated him on December 19, 2008, for the conduct described herein.

10. **David Applegate**, age 51, was ArthroCare's former Senior Vice President and General Manager, Spine Division. ArthroCare terminated him on December 19, 2008, for the conduct described herein. On July 19, 2011, an Agreed Final Judgment was entered against both Raffle and Applegate in *SEC v. Raffle, et al.,* Civil Action No. 1:11-cv-540 (W.D. Tex. [Austin Div.]): permanently enjoining each of them from future violations of the antifraud, record-keeping, reporting, internal controls, and as to Raffle, lying-to-accountants provisions of the

federal securities law; barring each of them from serving as an officer or director of a public company for a period of five years; and awarding monetary relief.

## FACTS

**A.     Background**

11.     ArthroCare develops, manufactures and markets surgical products in three business units: Sports Medicine, Spine, and Ear, Nose and Throat.  Among its products is a spine wand that assists treatment of patients with spinal injuries.  John Raffle, who reported to Baker, oversaw ArthroCare's three business divisions, including the Spine unit.  Applegate reported to Raffle, and managed the Spine unit.  Under their direction, ArthroCare overstated or prematurely recognized revenue in connection with a number of transactions, most of which were quarter-end sales to distributors, to meet particular revenue targets.  The following tables reflect the impact of their wrongdoing on ArthroCare's revenues and earnings:

**Impact on Total Revenues**

*(in thousands)*

| Period End | Filing Type | Originally Reported | As Restated | $ Difference | % Difference (of Restated) |
|---|---|---|---|---|---|
| 12/31/06 | 10K | $263,001 | $243,711 | $19,290 | 7.9% |
| 12/31/07 | 10K | $319,242 | $279,716 | $39,526 | 14.1% |
| 03/31/08 | 10Q | $91,035 | $77,553 | $13,482 | 17.4% |
|  |  | **$673,278** | **$600,980** | **$72,298** |  |

**Impact on Net Income**

*(in thousands)*

| Period End | Filing Type | Originally Reported | As Restated | $ Difference | % Difference (of Restated) |
|---|---|---|---|---|---|
| 12/31/06 | 10K | $31,675 | $27,673 | $4,002 | 14.5% |
| 12/31/07 | 10K | $43,180 | $491 | $42,689 | 8,694.3% |
| 03/31/08 | 10Q | $9,264 | $2,231 | $7,033 | 315.2% |
|  |  | **$84,119** | **$30,395** | **$53,724** |  |

**B.     DiscoCare**

12.     In 2004, sales in ArthroCare's spine unit stagnated because health insurers began declining reimbursement for the unit's primary device, the SpineWand. As a result, hospitals and other health care facilities did not purchase as many wands. One customer, however, had increased sales of the wand through a unique arrangement with a local personal injury law firm. This Florida-based customer – the Palm Beach Lakes Surgery Center ("PBLSC") – provided wands and treatment to the firm's clients (typically, accident victims) in return for an assignment of rights in subsequent settlements with the liability insurers. PBLSC invoiced the law firm for the wand and associated medical services, which the law firm then used as part of settlement negotiations with liability and workers' compensation insurers. When the insurer settled, PBLSC got paid. This arrangement allowed PBLSC to move a high volume of SpineWands while circumventing reimbursement restrictions imposed by health insurers.

13. Hoping to replicate PBLSC's success on a broader scale, PBLSC's founder created DiscoCare with Applegate's assistance. DiscoCare hired a former top ArthroCare salesman to help run the company, along with a number of other former ArthroCare employees, several of whom remained on ArthroCare's payroll and insurance benefits program. DiscoCare also shared office space with an ArthroCare branch office. ArthroCare was DiscoCare's only supplier.

### 1. *ArthroCare uses DiscoCare to reach revenue targets*

14. On December 23, 2005, ArthroCare and DiscoCare executed their first distributor agreement. The agreement contained an initial stocking order of $975,000. Because the sale was not contingent upon DiscoCare's ability to re-sell them or obtain collection, ArthroCare recorded the revenue immediately upon shipment. The stocking order enabled ArthroCare to meet its Q4 2005 revenue expectations. Under the terms of the distribution agreement, DiscoCare was not required to place additional orders until Q3 2006.

15. Despite the order's size – the $975,000 order was by far ArthroCare's largest order that quarter – and DiscoCare's recent incorporation, Raffle refused requests by finance personnel to check DiscoCare's background and credit. Instead, the company gave DiscoCare lengthier payment terms than usually afforded to distributors.

16. A few months later, ArthroCare recognized it would fall short of Q1 2006 revenue target because of disappointing international sales. Around the same time, DiscoCare discovered that collections under its arrangement with the law firm were taking much longer than expected. Consequently, DiscoCare lacked cash to pay ArthroCare, not only for future orders but also for the initial stocking order. Under the agreement at the time, DiscoCare was not obligated to buy any additional wands, and had not yet paid for the initial stocking order. Nevertheless,

ArthroCare agreed to give DiscoCare expanded territory if DiscoCare agreed to purchase more wands.  In connection with granting DiscoCare expanded territory rights, Raffle and Applegate asked DiscoCare to place another $975,000 order.  DiscoCare agreed, and the purchase enabled ArthroCare to reach its revenue target for Q1 2006.

### 2.     *ArthroCare smoothes earnings with product returns*

17.     ArthroCare again turned to DiscoCare to fill a revenue shortfall in Q2 of 2006.  The day before quarter-end, Raffle and Applegate asked DiscoCare to place a $500,000 order.  DiscoCare agreed even though it did not need the wands (it still had an oversupply from the first quarter 2006) and was not obligated to make additional purchases.

18.     The day after the quarter closed, Raffle realized ArthroCare did not need DiscoCare's order to reach its Q2 2006 target.  Raffle promptly decided to "move" half of DiscoCare's $500,000 order to the third quarter. Because analysts expected ArthroCare's revenue to be "flat" from Q2 to Q3, Raffle noted the shifting of revenues "effectively give us [sic] headstart on Q3."  Raffle then instructed DiscoCare to request a return through a process called Return Merchandise Authorization ("RMA"), to rescind its shipment.  This violated ArthroCare's return policy, which only permitted returns when ArthroCare shipped incorrect or defective product.  There were no incorrect or defective products here, since Raffle had selected the product DiscoCare received.  DiscoCare complied with Raffle's request and sought to return the product via RMA.

19.     Raffle then mislead ArthroCare accounting staff about the timing behind the RMA, telling them he had agreed to accept the RMA before Q2 closed and that the paperwork had merely gotten delayed "due to the last day of the quarter and then the holiday and my vacation this week."  When ArthroCare's outside auditor questioned Raffle about the RMA, he

mislead them, too, telling the auditor that the "distributors mistakenly bought incorrect items and/or quantities and [ArthroCare] agreed to accept returns in order to maintain good relations."

### 3. ArthroCare and DiscoCare execute a new distributor agreement

20. ArthroCare's Q3 sales again lagged behind projections. Consequently, Raffle and Applegate again asked DiscoCare to place a large order – $910,000 – on the final day of Q3. As with the prior quarter-end transactions, DiscoCare did not need, and did not expect to sell, the inventory in this order, and Arthrocare knew DiscoCare lacked the financial resources to pay for the inventory at the time it was shipped.

21. Around the same time, ArthroCare and DiscoCare executed a new distributor agreement dated November 1, 2006. A key provision in the new agreement was a "monthly service fee" payable to DiscoCare based on the number of wands sold and the average selling price of the wand, a provision suggested by Applegate and ultimately approved by Raffle. Under the new agreement, ArthroCare would credit half of the service fee every month against DiscoCare's outstanding receivable balance. The other half would be paid in cash to DiscoCare. The supposed purpose of this new fee was to compensate DiscoCare for distribution-related services – packaging, warehousing, restocking and the like – but DiscoCare had been providing these services without an extra fee for nearly a year at this point. The true purposes of the fee were to provide DiscoCare much needed cash flow and to allow ArthroCare to reduce the DiscoCare receivable on its books and give it the appearance of performing.

22. The new agreement with DiscoCare also prompted a change in how ArthroCare recognized revenue from sales to DiscoCare. Previously, ArthroCare had recognized sales to DiscoCare as revenue immediately upon shipment, since DiscoCare's price for product was fixed and determinable. Under the new agreement, however, the price varied based on the source of

payment to DiscoCare (*i.e.,* personal injury settlement, private health insurance, or workers' compensation). Accordingly, under the new agreement, ArthroCare was to recognize revenue from sales to DiscoCare only after "the case was completed," – when the underlying surgery had been performed – at which point the price was certain.

23. Almost immediately, ArthroCare sought to circumvent the new revenue recognition requirement. With less than a week left in 2006, Raffle noted that he needed to find $2 million in revenue to help the company meet its annual sales target. As usual, he and Applegate looked to DiscoCare as a solution. There were not enough cases that would be "completed" by year-end, however, to support recognizing this volume of revenue. Raffle and Applegate persuaded accounting personnel to record these additional sales to DiscoCare as revenue with the assurance that the case would be completed by the following quarter, rather than upon case completion. Raffle and Applegate also negotiated a retroactive price increase on sales to DiscoCare. This change increased the spine unit's revenue by 10% and the company's total revenue by 1%.

### 4. ArthroCare ships unnecessary "safety stock"

24. In March 2007, Applegate wanted to ship DiscoCare another stocking order to provide a cushion in case ArthroCare fell short of its quarterly revenue target. To accomplish this task, Applegate ghost-wrote a letter for DiscoCare claiming that DiscoCare needed to carry its own stock of inventory – a so-called "safety stock" – that would permit it to timely provide product to surgeons. This concern was fabricated; DiscoCare did not need a safety stock because it already carried excess inventory after buying large numbers of wands during 2006 to satisfy ArthroCare's demands. Nonetheless, ArthroCare shipped approximately $200,000 of Spine

Wands as "safety stock" and, based on Applegate's ghost-written letter, recorded the revenue immediately upon shipment.

### 5. ArthroCare records revenue for non-existent cases

25. During the final days of Q2 2007, Raffle and Applegate monitored ArthroCare's revenue on a daily basis and concluded that they needed to ship DiscoCare approximately $2.1 million of product before quarter-end to meet analyst expectations for ArthroCare. Under ArthroCare's accounting policies, these sales could be recognized as revenue only if they were associated with approved cases that would be completed during the quarter. But DiscoCare had only $900,000 of approved cases that would be completed before quarter end. Raffle and Applegate, however, hid this fact from ArthroCare's accounting staff.

### 6. ArthroCare buys DiscoCare to avoid disclosing DiscoCare's growing receivable

26. During the second half of 2007, Raffle realized that DiscoCare's accounts receivable balance had ballooned to $13 million (or 19% of ArthroCare's total accounts receivable) and wondered if "this may force our hand [with regard to] buying them out early." ArthroCare was also concerned that the DiscoCare receivable was negatively affecting the company's "days sales outstanding," a key metric tracked by analysts. In addition, the company was reluctant to reserve against the DiscoCare balance, because of the impact it would have on earnings.

27. ArthroCare's solution was to acquire DiscoCare, effective December 31, 2007. An acquisition would allow ArthroCare to eliminate the receivable on its consolidated balance sheet – afterward it became an intercompany balance – but would not erase prior sales to DiscoCare from ArthroCare's consolidated income statement. Raffle and Applegate, however, were not content with this outcome. Instead, before the acquisition was completed, Raffle and

Applegate approved shipment of $1.5 million of spine wands to DiscoCare, even those in which surgery had not been approved, thereby increasing revenue before the acquisition. Simultaneously, they asked DiscoCare to delay selling the wands until after the acquisition closed, which would allow ArthroCare to book revenue on the same wands again when they were sold.

C. **ArthroCare improperly recognizes revenue on sales to other distributors.**

　　1. *ArthroCare "grosses up" revenue by mischaracterizing payments to other distributors*

28.　　Historically, ArthroCare paid distributors commissions based on the volume of product ordered, and ArthroCare recorded the "net sale" – sales price minus the commission – as revenue in accordance with GAAP. However, to maximize revenue on sales to certain distributors, Raffle amended the compensation component of ArthroCare's distribution agreements, though the parties' relationship did not change.

29.　　Under the revised agreements, ArthroCare paid distributors a "marketing fee." The marketing fee allegedly differed from a commission because the fee compensated distributors for services rendered based on a number of variables, not just a strict mathematical calculation based on sales. The "formula" used to determine the marketing fee, however, was not spelled out in the distributor agreement. In fact, Raffle believed "it would be better to communicate the way in which we will work out the fee verbally, if they can live with that. If not, then perhaps a side letter that is not binding, but considered to be more of a good faith letter of how we would work together." ArthroCare recorded the gross amount of sales as revenue and expensed the marketing fee. Basically, this change enabled ArthroCare to increase revenue by the amount of the commission/marketing fee. In total, the gross-up allowed ArthroCare to inflate revenue by $4.5 million.

30.     In fact, ArthroCare determined the amount of the marketing fee exactly like it determined commission payments. After an accountant questioned another marketing fee calculation, Raffle instructed his sales staff to tweak or round off the dollar amount of the payment to avoid future detection. Raffle also persuaded one distributor to pay list price for the product, rather than at discount, in exchange for an increased "marketing fee."

### 2.     *ArthroCare records revenue on sales it did not expect to collect*

31.     ArthroCare also reached revenue targets by shipping large orders to distributors it knew could not or would not be able to pay. One such distributor simply lacked the resources to pay for the product ArthroCare insisted it purchase, prompting Raffle to orally promise that this distributor only had to pay for product it re-sold. Even after the distributor advised that it was unable to re-sell product, ArthroCare continued to request that the distributor place increasingly larger quarter-end orders and recorded the entire amount of the order as revenue upon shipment. The distributor paid ArthroCare only from the quarterly "marketing fees" it received based on the amount of product ordered. Basically, the distributor bought the products using ArthroCare's own money; its actual sales to end-users were negligible. For other distributors, ArthroCare agreed to provide rebates if they ultimately sold ArthroCare's products at a loss. By not seeking collection and by providing open-ended rebates to these distributors, ArthroCare did not have a fixed or determinable price for the goods it sold them. Therefore, ArthroCare should not have recognized revenue until the goods were used in surgery or sold to other customers.

**D.     As a result of the misconduct, ArthroCare issued materially inaccurate Commission filings.**

32.     ArthroCare overstated (1) revenue by $19.3 million in 2006, $39.5 million in 2007, and $13.5 million in Q1 2008; and (2) net income by $4.0 million in 2006, $42.7 million in 2007, and $7.0 million in Q1 2008. ArthroCare violated the securities provisions by reporting

materially misstated financial results in its 2006 and 2007 Form 10-Ks, in its Form 10-Qs for the quarters through the first quarter of 2008, and in various Form 8-Ks incorporating press releases it filed during this period.

33.     As the CEO and CFO, respectively, Defendants Baker and Gluk (Gluk assumed his role as CFO after ArthroCare issued its Form 10-Q for the period ended March 31, 2006) were in a position of ultimate responsibility for ArthroCare's financial condition and ArthroCare's proper and accurate reporting of that financial condition to the public.

**E.     ArthroCare was required to prepare restatements.**

34.     Due to ArthroCare's material non-compliance with the financial reporting requirements of the federal securities laws, which were the result of the misconduct, ArthroCare was required to, and did, in fact, issue accounting restatements.

35.     On November 18, 2009, ArthroCare filed its overdue Form 10-K for the year ending December 31, 2008, the company's first SEC filing since its Form 10-Q for the quarter ended March 31, 2008. As the company explained, "[w]e have experienced substantial delays in filing our periodic reports as a result of issues identified during a review of certain accounting and financial reporting matters as well as certain insurance billing and healthcare compliance practices … As a result of these reviews, [ArthroCare] restated our previously issued financial statements and made extensive organizational and operational changes, [and] improved our internal controls…" *See* pp. 3-4 of ArthroCare's Form 10-K for the year ending December 31, 2008, filed on November 18, 2009. The Annual report was filed concurrently with the company's Forms 10-Q for the quarters ended June 30, 2008, September 30, 2008, and March 31, 2009. In addition, this Form 10-K contained audited, *restated* financial statements for the years ended December 31, 2006 and 2007, as well as unaudited *restated* financial information for the quarter ended March 31, 2008. Even after concluding its internal investigation and restating

prior year financial results, ArthroCare acknowledged on-going material weaknesses and other control deficiencies that prevented the company from accurately reporting its financial results timely. *See id.* at p. 14.

36. ArthroCare's filing explained that its internal review focused on two areas: (1) accounting issues and internal controls; and (2) insurance billing and healthcare compliance. Specifically, ArthroCare's internal review:

> identified facts indicating that our sales management and certain other senior managers maintained a significant focus on achieving particular revenue growth objectives over time. To that end, a substantial number of the transactions that were identified by the Review and corrected as a result of the restatement were quarter-end transactions and were frequently structured by our sales management to result in revenue being recognized in a particular quarter in order to meet revenue forecasts. The Review identified facts that indicate the practices that were employed to that end included, but were not limited to: deviating from existing revenue recognition policies developed for sales to a particular distributor; requesting or allowing returns and exchanges contrary to our policy; encouraging distributors to place orders while knowing the distributor's heightened inventory level; shipping nonconforming goods; splitting a single purchase order into multiple smaller purchase orders for the specific purpose of recognizing revenue in multiple periods; selling to customers without sufficient evidence that collectability of the related receivable was reasonably assured; and shipping product in advance of due dates identified in the purchase orders.

*See id.* at pp. 39-40.

The bulk of these facts ultimately formed the basis of the allegations against Raffle and Applegate, described in detailed herein.

### F. During the relevant time periods, Defendants received SOX 304 compensation and profits from the sales of ArthroCare stock.

37. During the 12-month periods following ArthroCare's filing of its inaccurate financial statements from Q1 2006 through Q1 2008 – and before any restatement or correcting disclosure by ArthroCare – Defendants received SOX 304 compensation and profits from their sales of ArthroCare stock.

38.     During this same time period, Defendants also were awarded options and shares of restricted ArthroCare common stock which were to vest in various subsequent years upon the achievement of certain performance criteria or continued employment.

39.     Defendants have not reimbursed ArthroCare for the SOX 304 compensation and profits from their sales of ArthroCare stock received during the relevant statutory periods.

## CLAIM FOR RELIEF

### FAILURE TO REIMBURSE
(Violation of Section 304(a) of the Sarbanes-Oxley Act of 2002)

40.     The Commission realleges and incorporates by reference ¶¶ 1 through 39 above.

41.     ArthroCare, by engaging in the aforementioned conduct, filed Forms 10-Q and 10-K for fiscal years 2006 and 2007, as well as Form 10-Q for the period ended March 31, 2008, that were in material non-compliance with its financial reporting requirements under the federal securities laws.

42.     ArthroCare's material non-compliance with its financial reporting requirements under the securities laws was the result of its misconduct that improperly inflated ArthorCare's revenues and earnings using a variety of techniques, including channel stuffing, shipments of nonconforming goods at quarter ends, and oral assurances to vendors that collection would not be sought on shipments.

43.     Due to ArthroCare's material non-compliance with its financial reporting requirements, and as a result of its misconduct, ArthroCare was required to prepare accounting restatements for fiscal years 2006 and 2007 and the first quarter of 2008.

44. Defendants have failed to reimburse ArthroCare for the SOX 304 compensation or profits from their sales of ArthroCare stock received or obtained during the statutory time periods established by the Sarbanes-Oxley Act of 2002.

45. The Commission has not exempted Defendants, pursuant to Section 304(b) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(b)], from its application under Section 304(a) [15 U.S.C. § 7243(a)].

46. By engaging in the conduct described above, Defendants violated, and unless ordered to comply will continue to violate, Section 304(a) of the Act, 15 U.S.C. § 7243(a).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment: (1) ordering each Defendant to reimburse ArthroCare for all SOX 304 compensation and profits realized from his sales of ArthroCare stock during the relevant statutory time periods pursuant to and established by Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243]; and (2) granting such other and further relief as this Court may deem just and appropriate.

Dated: April 2, 2012                          Respectfully submitted,

                                              */s/Jennifer D. Brandt*
                                              Jennifer D. Brandt
                                              Texas Bar No. 00796242
                                              James E. Etri
                                              Texas Bar No. 24002061
                                              United States Securities and Exchange Commission
                                              Burnett Plaza, Suite 1900
                                              801 Cherry Street, Unit #18
                                              Fort Worth, Texas 76102-6882
                                              Phone: (817) 978-6442
                                              Fax: (817) 978-4927
                                              *BrandtJ@sec.gov*
                                              ATTORNEYS FOR PLAINTIFF