**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**SECURITIES AND EXCHANGE COMMISSION,**
**Plaintiff,**

**-vs-**                                              **Case No.  A-12-CA-285-SS**

**MICHAEL A. BAKER and MICHAEL T. GLUK,**
**Defendants.**

_____

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Michael A. Baker's and Michael T. Gluk's Motions to Dismiss [##12, 13], Plaintiff Securities and Exchange Commission (SEC)'s Response [#19] thereto, and Defendants' Replies [##22, 23]. Having considered the documents, the file as a whole, and the governing law, the Court now enters the following opinion and orders, denying the motions.

**Background**

This case is one in a series of actions arising out of the Arthrocare securities scandal. Here, the SEC, acting under § 304 of the Sarbanes–Oxley Act, is seeking statutory reimbursement—on behalf of Arthrocare—of cash bonuses, incentives, and equity-based compensation (collectively known as "§ 304 Compensation") earned by Arthrocare's CEO (Baker) and CFO (Gluk). The § 304 Compensation the SEC seeks reimbursement of was earned during the years following Arthocare's filing of quarterly (Form 10-Q) and annual (Form 10-k) financial statements which were subsequently restated due to alleged fraud by two senior vice presidents of Arthrocare, John Raffle

and David Applegate.[1]  The statements in question were filed in 2006, 2007, and the quarter ending March 31, 2008.  Baker and Gluk are not alleged in the Complaint to have committed any conscious wrongdoing; rather, the SEC argues they are required to reimburse Arthrocare simply because they were the CEO and CFO at the time (and thus signed the filings which subsequently required restatements).  Baker and Gluk have moved under Rule 12(b)(6) to dismiss the SEC's complaint, arguing it fails to state a claim for which relief can be granted because § 304 either cannot be construed as broadly as the SEC claims; i.e., to impose liability on CEOs and CFOs without any element of scienter, or, alternatively, because § 304 is unconstitutional.  They also raise a statutory defense in the form of the Civil Asset Forfeiture Reform Act.

## Discussion

## I.      Motion to Dismiss—Rule 12(b)(6)—Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although

---

[1] The SEC brought a separate civil proceeding against Raffle and Applegate, which resulted in agreed judgments favorable to the SEC.  *See SEC v. Raffle*, No. 1:11–CA–540–SS (W.D. Tex. July 12, 2011) (agreed final judgment against Applegate); *id.* (W.D. Tex. July 18, 2011) (agreed final judgment against Raffle).  A criminal proceeding against Raffle and Applegate is still pending.  *See United States v. Raffle*, No. 1:12–CR–314–SS (W.D. Tex. Aug. 21, 2012) (indictment filed).

a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.    Section 304

Section 304 of the Sarbanes–Oxley Act, entitled "Forfeiture of certain bonuses and profits," provides:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

(b) Commission exemption authority

The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

15 U.S.C. § 7243 [hereinafter § 304].

Although § 304 does not create any private right of action, it nevertheless "establishes that the SEC may sue the CEO and CFO of a company when the company has been required to restate its earnings due to noncompliance with securities laws." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 793 (D.C. Cir. 2008). "Section 304 by its terms requires CEOs and CFOs to reimburse their company for any bonus or similar compensation, or any profits realized from the sale of company stock, for the 12–month period following a false financial report, if the company 'is required to prepare an accounting restatement due to the material noncompliance of the [company], as a result of misconduct.'" *Cohen v. Viray*, 622 F.3d 188, 193 (2d Cir. 2010) (quoting § 304). "Under § 3(b)(1) of SOX, moreover, the SEC has authority to enforce § 304 pursuant to its authority to enforce any provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(1)." *Id.* (citing 15 U.S.C. § 7202(b)(1)).

For reasons best known to the SEC, the Commission has been historically reluctant to utilize § 304 in the ten years since Sarbanes–Oxley was enacted. *See* Alison List, Note, *The Lax Enforcement of Section 304 of Sarbanes–Oxley: Why is the SEC Ignoring its Greatest Asset in the*

*Fight Against Corporate Misconduct?*, 70 OHIO ST. L.J. 195, 216 (2009).  However, a sword does not cease to be a sword, even though it may languish in the scabbard, and likewise, federal agencies have discretion in when and how to carry out regulatory enforcement actions.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").  Indeed, a few scholarly articles have called upon the SEC to begin wielding § 304 more aggressively.  *See* List, *Lax Enforcement*, *supra*, at 247; Rachael E. Schwartz, *The Clawback Provision of Sarbanes–Oxley: An Underutilized Incentive to Keep the Corporate House Clean*, 64 BUS. LAW. 1, 34 (2008).  The SEC, perhaps heeding those calls,[2] has filed a number of actions in recent years seeking to compel CEOs and CFOs to reimburse their employers in the wake of SEC restatements.  *See, e.g.*, *SEC v. Jasper*, No. C 07–06122 JW, 2010 WL 8781211, at *14 (N.D. Cal. July 21, 2010) (order granting SEC's "motion to require Defendant to reimburse [the issuer] $1,869,639 pursuant to Section 304(a) of the Sarbanes–Oxley Act"), *aff'd*, 678 F.3d 1116 (9th Cir. 2012).

However, most prior actions have involved allegations of improprieties by the CEO or CFO in question.  *See, e.g.*, *id.* at *2 ("[T]he SEC presented evidence demonstrating that Defendant intentionally concealed Maxim's backdating practices from Board members.").  In such cases, § 304 was asserted as an ancillary claim, standing alongside more traditional securities causes of action, such as violations of § 10(b) of the Securities and Exchange Act.  *See id.* at *1.  What is apparently unusual about this case is the SEC's decision to seek standalone § 304 reimbursement where, "The

---

[2]Interestingly, the latter article was written by a senior counsel within the SEC's enforcement division.  *See* Schwartz, *The Clawback Provision*, *supra*, at 1 n.a1.

Commission does not allege that Baker and Gluk participated in the wrongful conduct."  Pl.'s Compl. [#1], ¶ 2.  Apparently, the SEC has decided to adopt a more aggressive interpretation of the reach of § 304, as was earlier recommended by an SEC senior counsel.  *See* Schwartz, *The Clawback Provision*, *supra*, at 2 ("This Article considers a key issue in section 304 enforcement.  The statutory language does not require the officer from whom a clawback is sought to have personally engaged in the misconduct that led to the restatement.  Should such a requirement be read into the statute?  This Article explains why it should not.").

## III.   Baker and Gluk's Arguments

Plainly, the SEC has pled the requisite elements of the statute.  There is no question Arthrocare had to file restatements for the periods in question.  *Cf. SEC v. Shanahan*, 624 F. Supp. 2d 1072, 1078 (E.D. Mo. 2008) (dismissing the SEC's § 304 claim where no restatement had been filed).  Those restatements were allegedly necessitated by misconduct, namely, the acts of Raffle and Applegate, which are plausibly attributable under agency principles to Arthrocare.  *See In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 802, 823 (Del. Ch. 2009).  And there is no dispute Baker and Gluk received § 304 Compensation within the time period covered by the Complaint, i.e., within a year of the various Forms 10-k and 10-q which were subsequently restated.

Baker and Gluk, in the vehicle of Rule 12 motions, nevertheless raise three lines of attack. First, they argue § 304 should be construed to include additional requirements beyond the import of the text, specifically: (1) to require misconduct by the corporate officer himself, (2) to define "misconduct" as an independent violation of securities law, (3) as only providing a remedy for the SEC when an officer engages in misconduct which is itself a violation of another securities law, or (4) as constituting an equitable disgorgement provision only (and thus being limited in application

to cases of misconduct by the officer in question, or thereby limiting recovery to amounts attributable to the misconduct).

Second, Baker and Gluk challenge the constitutionality of § 304, if it is given the meaning and effect advocated by the SEC.  In particular, they assert it is (1) void for vagueness, (2) violates the Excessive Fines Clause, and (3) violates the Due Process Clause by not requiring any reasonable relationship between the triggering conduct and the penalty.

Finally, Baker and Gluk argue the Civil Asset Forfeiture Reform Act (CAFRA) independently bars a § 304 action against "innocent" officers such as themselves.

The Court is not apprised of any cases addressing the particular challenges raised by Baker and Gluk, with the partial exception of a decision by the District Court of Arizona, which, like this case, was a § 304 action brought in the absence of any misconduct by the defendant officer.  *See SEC v. Jenkins*, 718 F. Supp. 2d 1070, 1072 (D. Ariz. 2010) ("Although the SEC does not allege that Jenkins personally was aware of the fraudulent concealment perpetrated by various . . . officers, Jenkins did certify the company's inaccurate financial statements.").  *Jenkins* persuasively rejected similar attempts by the officer defendant to read into the statute a requirement of misconduct by the officer.  *Id.* at 1075–76.  *Jenkins* declined to address similar constitutional challenges, noting "even if these constitutional concerns have merit, the facts necessary to decide these constitutional issues cannot be decided on a motion to dismiss." *Id.* at 1076.  Finally, *Jenkins* also declined to rule on the applicability of CAFRA, finding it was not raised in the motion to dismiss, despite being available to the defendant when the motion was filed.  *Id.* at 1080.  However, *Jenkins* did express doubts as to whether CAFRA applies, because CAFRA limits civil forfeiture statutes, which are "*in rem* proceeding[s] against a property that is sought to be forfeited to the government," whereas in seeking

to enforce § 304, the SEC was attempting to require the officer to reimburse the company (in an *in personam* action), not to obtain any forfeiture to the government. *Id.* at 1080. The Court finds the reasoning in *Jenkins* generally sound and persuasive.

The Court now turns to the three groups of arguments raised by Baker and Gluk.

## A.      Construction of § 304

## 1.      Scienter or Separate Misconduct

The Court rejects these claims. The text of the statute plainly contains no such additional requirements, and absent any ambiguity, the words of the statute itself are dispositive. *See CenterPoint Energy Houston Elec. LLC v. Harris Cnty. Toll Rd. Auth.*, 436 F.3d 541, 545 (5th Cir. 2006).

Rather, the statute unambiguously requires CEOs and CFOs to reimburse the issuer for any qualifying compensation they receive within one year of a filing which the issuer is subsequently forced to restate due to misconduct by the issuer or its agents. *See* 15 U.S.C. § 7243(a). The handful of cases which have had occasion to describe the import of § 304 are likewise devoid of any mention of a scienter requirement. *See Cohen*, 622 F.3d at 193; *Pirelli Armstrong Tire Corp.*, 534 F.3d at 793. Using persuasive reasoning, and directly addressing this issue, the Arizona District Court reached the same conclusion:

> [T]he Court holds that the text and structure of Section 304 require only the misconduct of the issuer, but do not necessarily require the specific misconduct of the issuer's CEO or CFO.
>
> . . .
>
> The relevant statutory phrase specifies that the reimbursement obligation is triggered if an issuer has to prepare an accounting restatement "due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws." 15 U.S.C. § 7243(a). The ordinary, contemporary and common meaning of that language is that the misconduct of the

-8-

issuer is the misconduct that triggers the reimbursement obligation of the CEO and the CFO.

. . .

As the title of the subsection makes plain, it was Congress's purpose to recapture the additional compensation paid to a CEO during any period in which the corporate issuer was not in compliance with financial reporting requirements.  A CEO need not be personally aware of financial misconduct to have received additional compensation during the period of that misconduct, and to have unfairly benefitted therefrom.  When a CEO either sells stock or receives a bonus in the period of financial noncompliance, the CEO may unfairly benefit from a misperception of the financial position of the issuer that results from those misstated financials, even if the CEO was unaware of the misconduct leading to misstated financials.  It is not irrational for Congress to require that such additional compensation amounts be repaid to the issuer.

*Jenkins*, 718 F. Supp. 2d at 1074–75.

And the Northern District of Texas has held likewise: "Section 304 contains no personal wrongdoing element."  *SEC v. Microtune*, 783 F. Supp. 2d 867, 886 (N.D. Tex. 2011).

Although it might be surprising at first glance to require CEOs and CFOs to reimburse their employers when they have not done anything illegal, there are good policy reasons why Congress may have provided for the broad scope of § 304 suggested by the SEC.

"The SEC's decision to pursue § 304 relief is not solely intended to reimburse a company; it also furthers important public purposes.  The § 304 remedy is an enforcement mechanism that ensures the integrity of the financial markets."  *Cohen*, 622 F.3d at 195.  "Imagine if someone told you that they would take away half of everything you earned this year if you did not catch the misconduct of one of your employees.  You would most likely be highly motivated to catch the misconduct."  List, *Lax Enforcement*, *supra*, at 195.  "[Sarbanes–Oxley] . . . requires CEOs and CFOs to certify their companies' financial reports, outlaws fraud and deception by managers in the auditing process, *prevents CEOs and CFOs from benefitting from profits they receive as a result of*

*misstatements of their company's financials*, and facilitates the imposition of judicial bars against officers and directors who have violated the securities laws."  S. Rep. No. 107–205, 2002 WL 1443523, at *23 (2002) (emphasis added).

If the legislative history is any indication, Congress had facts similar to this case squarely in mind in enacting SOX: "Title III includes provisions designed to prevent CEOs or CFOs from making large profits by selling company stock, or receiving company bonuses, while *management* is misleading the public and regulators about the poor health of the company."  *Id.* at *26 (emphasis added).  That is precisely what happened here: Baker and Gluk received generous compensation, while two managers, Raffle and Applegate, were misleading the public about Arthrocare's financial condition.  Furthermore, Congress appears to have specifically wanted to expand instances in which CEOs and CFOs are required to return certain profits beyond income attributable to a particular violation:

> For a securities law violation, currently an individual may be ordered to disgorge funds that he or she received "as a result of the violation." Rather than limiting disgorgement to these gains, the bill will permit courts to impose any equitable relief necessary or appropriate to protect, and mitigate harm to, investors.

*Id.*

To limit the scope of § 304 as Baker and Gluk suggest would render it a meaningless act on the part of Congress, because the SEC's power to seek equitable disgorgement of profits gained through wrongdoing pre-dates Sarbanes–Oxley by many years. *SEC v. DiBella*, 409 F. Supp. 2d 122, 130 (D. Conn. 2006); John Patrick Kelsh, *Section 304 of the Sarbanes–Oxley Act of 2002: The Case for a Personal Culpability Requirement*, 59 Bus. Law. 1005, 1016 (2004) ("Disgorgement in these pre-Sarbanes–Oxley proceedings has generally been limited to those instances in which the

defendant was in clear violation of the securities laws, and the amount required to be disgorged has been limited to that which is obviously traceable to the underlying wrongdoing.").  Rather, for § 304 to have any meaning beyond mere exhortatory rhetoric, the Court must give effect to the statute as written, and as argued by the SEC: reimbursement is required without any showing of wrongdoing by the CEO or CFO, and the amount or reimbursement is not limited to income attributable to the wrongdoing of others.

In addition, and contrary to Baker and Gluk's arguments, this interpretation is consistent with both other provisions of Sarbanes–Oxley, and with securities laws generally.  As noted above, § 304 ties in closely with the various duties required of CEOs and CFOs in § 302 of Sarbanes–Oxley,[3] and it creates an incentive for them to be diligent in carrying out those duties.  The absence of any requirement of personal misconduct is in furtherance of that purpose: it ensures corporate officers cannot simply keep their own hands clean, but must instead be vigilant in ensuring there are adequate controls to prevent misdeeds by underlings.

In addition, various other securities laws penalize active wrongdoing, either on the basis of intentional, knowing, or negligent acts or omissions.  *See* 15 U.S.C. §§ 77o, 77q(a), 78; 17 C.F.R. §§ 240.10b-5, .13a-14.  By requiring reimbursement, even in the absence of any wrongdoing, Congress was logically extending and expanding the regulatory scheme for publicly traded securities in reaction to the various accounting scandals which triggered Sarbanes–Oxley.  By contrast, Baker and Gluk's proposed constructions would render § 304 redundant of existing civil and criminal securities fraud laws.

---

[3] *See* 15 U.S.C. § 7241 (enumerating various reporting, filing, and certification requirements, which CEOs and CFOs represent they have faithfully carried out by signing annual and quarterly SEC filings).

2.      **Equitable Disgorgement**

In their final construction argument, Baker and Gluk argue § 304 should be construed as some type of statutory disgorgement provision, equivalent to the long-standing common-law doctrine of equitable disgorgement.  This is significant, because disgorgement on equitable grounds is generally limited to cases in which the officers themselves have engaged in wrongdoing.  *See, e.g.*, *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).  In arguing § 304 constitutes a statutory disgorgement remedy, Baker and Gluk principally rely on the following language from Ninth and Second Circuit decisions: "the reimbursement provision of SOX 304 is considered an equitable disgorgement remedy," *S.E.C. v. Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012), and "[Section 304] reflects Congress's efforts to make high ranking corporate officers of public companies directly responsible for their actions that have caused material noncompliance with financial reporting requirements," *Cohen*, 622 F.3d at 195.  They also point to *In re Digimarc*, in which the Ninth Circuit, while finding § 304 does not provide a private cause of action, stated: "Sections 304 and 306, meanwhile, both require non-compliant directors and officers to reimburse the issuer by disgorging the profits of their noncompliance. . . . They require wrongdoers to reimburse the issuer for ill-gotten gains . . . ." 549 F.3d 1223, 1232–33 (9th Cir. 2008).

For its part, the SEC argues, *inter alia*, (1) § 304 is a cause of action, not just a remedy, and (2) "reimbursement" has a different meaning—one not necessarily connected to misconduct—than "disgorgement."  *Cf. SEC v. AMX Int.'l, Inc.*, 7 F.3d 71, 74–76 (5th Cir. 1993) (comparing "disgorgement" to "debt" and "restitution").  The Court agrees.  The Court also rejects Baker and Gluk's argument for three additional reasons.  It is nowhere written that Congress is required to craft causes of action which precisely mirror existing remedies at law or equity.  Section 304 may well

be *sui generis*, and the Court sees no reason why Congress was not free to create a unique cause of action, in addressing the singular events which heralded Sarbanes–Oxley.  In addition, Baker and Gluk's interpretation cannot be harmonized with the language of § 304, which is devoid of any necessary link between the acts of the CEO or CFO, and the compensation which is subject to reimbursement.  Finally, the cases they rely on either (1) are not binding on this Court, (2) did not consider this precise issue, or (3) do not support their position.

Baker and Gluk are correct the Ninth Circuit has held § 304 is an equitable disgorgement remedy.  "Ninth Circuit law is clear that the reimbursement provision of SOX 304 is considered an equitable disgorgement remedy and not a legal penalty." *Jasper*, 678 F.3d at 1130 (relying on *In re Digimarc*, 549 F.3d at 1232–33).  However, neither *Jasper* nor *Digimarc* address whether this in turn limits § 304 reimbursement to profits attributable to wrongdoing.  Even if the Ninth Circuit would agree with Baker and Gluk, this Court is not bound by its rulings.  And, with all respect due to the Ninth Circuit, the Court would disagree if it so held, for the many reasons listed elsewhere in this opinion.

This Court is not alone: the Northern District of Texas, addressing whether the statute of limitations applies to a § 304 action, held § 304 reimbursement is a penalty, not a disgorgement.  *Microtune*, 783 F. Supp. 2d at 886–87 (holding five-year statute of limitations, codified at 28 U.S.C. § 2462, applies to § 304 action).  "[T]his very case highlights the difference between Section 304's statutory reimbursement remedy and equitable disgorgement—Section 304 contains no personal wrongdoing element, in contrast to disgorgement, that would require scienter or misconduct on behalf of the officers in order to trigger reimbursement." *Id.* at 886.

*Cohen*, the Second Circuit case relied on by Baker and Gluk, in fact distinguished between § 304 actions and equitable disgorgement, noting: "It is true the SEC could order disgorgement. The terms of the indemnification agreement, however, would allow [the CEO and CFO] to pass that claim on to [the issuer] so that they, individually, would suffer no penalty at all." 622 F.3d at 195. *Cohen* went on to hold that because such a result would frustrate Congressional intent in enacting § 304, the indemnification agreement could not stand: a result which it could not have reached if § 304 was no more than a codification of the equitable disgorgement remedy.

For all the foregoing reasons, the Court holds § 304 is not equivalent to equitable disgorgement.[4]  Having found Baker and Gluk's arguments regarding the proper construction of § 304 lack merit, the Court turns to their constitutional challenges.

**B.      Constitutionality of § 304**

As a general matter, the Court finds § 304 constitutional on its face.  *See SEC v. Geswein*, No. 5:10CV1235, 2011 WL 4541303, at *3 (N.D. Ohio Sept. 29, 2011) (rejecting Due Process, Excessive Fines Clause challenges, upon finding the defendants "have not demonstrated that Section 304 is unconstitutional on its face").  Baker and Gluk have not, and cannot, argue they are members of any protected class, or otherwise shown fundamental rights are at stake, requiring a heightened level of scrutiny.  Accordingly, only rational basis review applies. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for

---

[4]The Court makes no finding as to whether § 304 is a penalty, because it is not necessary to make such a determination here.

-14-

the classification.").  As discussed above, there is a rational basis for § 304: it creates a personal incentive for CEOs and CFOs to take their reporting and certification duties seriously.

1.      **Void for Vagueness**

In their vagueness challenge, Baker and Gluk argue it is unclear *whose* misconduct will trigger reimbursement.  The Court disagrees.  The statute provides: "If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws . . . ."  15 U.S.C. § 7243(a).  Reimbursement is triggered when there is "material noncompliance of the issuer," and this phrase is immediately limited by the following clause, "as a result of misconduct."  Accordingly, the "misconduct" in question is misconduct by the issuer.  And, of course, because issuers are corporations and similar business entities, "issuer" includes its agents, acting within the course and scope of their employment.  *See In re Am. Int'l Grp., Inc.*, 965 A.2d at 802, 823.  As a practical matter, the "who" will also no doubt be limited to those agents of the issuer who are in sufficiently high-ranking positions as to be able to cause "material noncompliance . . . with any financial reporting requirement under the securities laws."  15 U.S.C. § 7243(a).  Which, not coincidentally, is precisely what is alleged to have happened in this case.  Raffle and Applegate, who were senior vice presidents, apparently used their positions of authority to perpetrate serious misconduct, over a significant period of time.  Baker and Gluk should have been monitoring the various internal controls to guard against such misconduct; they signed the SEC filings in question, and represented they in fact were actively guarding against noncompliance.  As such, they shouldered the risk of § 304 reimbursement when noncompliance nevertheless occurred.

-15-

Baker and Gluk also argue § 304 is vague because it does not clearly state when or why liability will be imposed.  The Court again disagrees, because § 304's requirements upon CEOs and CFOs are crystal clear, when read in conjunction with the rest of Sarbanes–Oxley.  Section 302 of the Act tells executives precisely what they must do to avoid reimbursement liability under § 304: they must ensure the issuer files accurate financial statements.  And it tells them how they are to go about doing so, such as by: "establishing and maintaining internal controls," "design[ing] such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities," "evaluat[ing] the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report," and "present[ing] in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date."  15 U.S.C. § 7241(a)(4)(A–D).[5]

In addition, Baker and Gluk's arguments they had no notice of § 304's meaning lack merit. Section 304 was passed years before the events in question, and, as noted above, has been the subject of a vigorous discussion in legal academia.  On these facts, ignorance of the law is no excuse.

**2.      Excessive Fines Clause**

Baker and Gluk argues § 304 violates the Excessive Fines Clause of the Eight Amendment. However, the Excessive Fines Clause is inapplicable here, because § 304 only requires reimbursement to the issuer: no money is forfeited to the government.  *Austin v. United States*, 509 U.S. 602, 609 (1993) ("The Excessive Fines Clause limits the government's power to extract

---

[5]These are not the only provisions of § 302 which inform CEOs and CFOs of what is expected of them: they are also required to certify (1) to having read the filing, (2) that it is true and accurate to the best of their knowledge, (3) they have disclosed to the auditors and the audit committee any deficiencies in the internal controls, (4) disclosure of any known fraud "that involves management or other employees who have a significant role in the issuer's internal controls," and (5) whether there were any subsequent changes in the internal controls, including corrective actions.  15 U.S.C. § 7241(a)(1–3, 5–6).

payments . . . .").  In addition, the Court finds § 304 is at least partly remedial in nature, and so falls

outside the scope of the Excessive Fines Clause.  *See id.* at 609–10.

3.      **Due Process Clause**

Baker and Gluk assert § 304 violates the Due Process Clause by not requiring any reasonable

relationship between the triggering conduct and the penalty imposed on an otherwise innocent

person.  However, they cite no authority which is on point.  For example, *BMW of North America,*

*Inc. v. Gore*  is irrelevant because it concerns punitive damages awarded against tortfeasors.  517

U.S. 559, 568 (1996).  Assuming *arguendo* § 304 reimbursement is a penalty, the Court finds there

is a reasonable relationship between the triggering conduct and the penalty.  First, by signing SEC

filings, corporate officers are making solemn guarantees that they have carefully reviewed the filings

for accuracy, and that such accuracy is underwritten by adequate controls.  When, as here, those

controls prove inadequate, and corporate officers are asleep on their watch, it is reasonable for

Congress to impose a penalty.  The degree of penalty is reasonable too: it is limited to bonuses,

incentive-based pay, and stock-sales profits.  Officers' base salaries are outside the scope of § 304.

Furthermore, Congress provided a safety valve, namely the SEC's power to exempt corporate

officers when appropriate.

Baker and Gluk also argue § 304 fails to provide fair notice, but this argument fails, because,

as discussed in the vagueness subsection, *supra*, Sarbanes–Oxley as a whole providess ample notice

of what conduct is required.  Finally, it goes without saying the SEC must file a lawsuit in federal

court in order to force corporate officers to reimburse their employers under § 304; in such

proceedings, the officers have the full panoply of due process protections afforded civil defendants,

such as, to take a random example, the opportunity to test the adequacy of the SEC's pleadings via long and complex Rule 12(b)(6) motions.  Accordingly, there is no due process violation.

## C.    CAFRA

CAFRA provides: "an innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).  CAFRA application is obviously limited to civil forfeiture statutes, which it defines as "any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense."  *Id.* § 983(i)(1).  An innocent owner under CAFRA is "an owner who – (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  *Id.* § 983(d)(2)(A).

The parties dispute whether § 304 is a civil forfeiture statute to which CAFRA applies.  Baker and Gluk argue: (1) § 304 is entitled "Forfeiture of Certain Bonuses and Profits"; (2) several statutes are specifically exempted from CAFRA, but § 304 is not among them, *see id.* § 983(i)(2); and (3) the SEC itself has referred to § 304 as providing for "forfeiture" in public statements, *see, e.g.*, S.E.C. Lit. Release No. 21598, (July 22, 2010), *available at* http://www.sec.gov/litigation/litreleases/2010/lr21598.htm (reporting a court-ordered "forfeiture of bonuses and stock sales pursuant to Section 304(a) of the Sarbanes-Oxley Act").

The Court finds CAFRA is inapplicable to an action under § 304.  First and foremost, the Supreme Court has explained that civil forfeiture actions are *in rem* proceedings, *see United States*

*v. Ursery*, 518 U.S. 267, 275 (1996),[6] whereas § 304 plainly creates an *in personam* cause of action.

That CAFRA is in fact limited to *in rem* actions is confirmed by its definition of innocent owner as

being one who "did all that reasonably could be expected under the circumstances *to terminate such*

*use of the property.*"  18 U.S.C. § 983(d)(2)(A) (emphasis added).  This language is only logical in

the context of *in rem* forfeiture proceedings: such forfeitures are justified because the owner

permitted the property in question to be used for an illegal purpose.  By contrast, a § 304 action has

nothing to do with property being put to an illegal purpose; rather, it is directed at failure to comply

with securities filing requirements.[7]

In the face of this clear guidance from both the Supreme Court, and the language of the

statutes themselves, the Court rejects Baker and Gluk's arguments.  In particular, the Court cannot

use the language of the title of § 304 to vary the import of the statute itself.

> [T]he title of a statute and the heading of a section cannot limit the plain meaning of
> the text.  For interpretative purposes, they are of use only when they shed light on
> some ambiguous word or phrase. They are but tools available for the resolution of a
> doubt. But they cannot undo or limit that which the text makes plain.

*B'hood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29 (1947) (citations omitted).

Here, § 304 is unambiguously *not* an *in rem*, civil forfeiture statute.  Accordingly, the title

of § 304 has no role to play in construing the language of the statute itself.  *See id.*

---

[6] Since the earliest years of this Nation, Congress has authorized the Government to
seek parallel *in rem* civil forfeiture actions and criminal prosecutions based upon
the same underlying events. . . . [T]he Court dr[aws] a sharp distinction between *in
rem* civil forfeitures and *in personam* civil penalties such as fines . . . .
*Ursery*, 518 U.S. at 274–75.

[7] Baker and Gluk argue CAFRA has a broader scope than traditional civil forfeiture actions, which were
predicated on criminal prosecutions, because the exempted statutes include ones which govern forfeiture of property
under circumstances other than prosecutions, such as violations of the Internal Revenue Code, or federal customs law.
This may well be true; but it does not follow that merely because the *in rem* proceedings covered by CAFRA include
those outside of the criminal context, *in personam* actions such as § 304 would be covered as well.

Nor, for that matter, do passing references by the SEC to § 304 constituting a "forfeiture" have any effect to contradict the meaning of both § 304 and CAFRA. They are the agency equivalents of dicta; worse than that, a bedrock principle of Congressional delegations to regulatory agencies is the agency's interpretations cannot contravene the unambiguous meaning of the federal law under whose authority they act. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Moreover, the SEC statements Baker and Gluk point to are press releases, not formal actions by the SEC.

Regarding the fact § 304 is not listed in the statutes exempted from CAFRA, if § 304 is not a civil forfeiture at all, there would be no need to include it in the listed exemptions.

Finally, § 304 was passed some two years after CAFRA. Congress is presumed to be aware of existing laws when enacting any new statute. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998). If Baker and Gluk are correct that CAFRA applies to § 304 proceedings, then it would follow Congress chose to enact a meaningless statute in § 304, because recovery of compensation from CEOs and CFOs who are not "innocent owners" is already provided for by various other provisions of the Sarbanes–Oxley Act and the Securities and Exchange Act—and such recovery, prior to § 304's enactment, was limited to wrongdoers, to whom CAFRA's protection would be unavailable. Of course, Congress is further presumed to *not* engage in meaningless acts, *cf. Canal Ins. Co. v. Coleman*, 625 F.3d 244, 253 (5th Cir. 2010); as such, the Court finds Congress must have assumed and intended CAFRA would have no application to § 304.

## Conclusion

Apologists for the extraordinarily high compensation given to corporate officers have long-justified such pay by asserting CEOs take "great risks," and so deserve great rewards. For years, this

has been a vacuous saw, because corporate law, and private measures such as wide-spread indemnification of officers by their employers, and the provision of Directors & Officers insurance, have ensured any "risks" taken by these fearless captains of industry almost never impact their personal finances.[8]  In enacting § 304 of Sarbanes–Oxley, Congress determined to put a modest measure of real risk back into the equation.  This was a policy decision, and while its fairness or wisdom can be debated, its legal effect cannot.  Section 304 creates a powerful incentive for CEOs and CFOs to take their corporate responsibilities very seriously indeed.[9]  The Court finds the SEC's interpretation of § 304 is both correct, and does not offend the Constitution.  Nor is CAFRA applicable.  Therefore, the SEC has stated a claim for which relief can be granted.

Accordingly,

IT IS ORDERED that Defendant Michael A. Baker's Motion to Dismiss [#12] is DENIED;

IT IS FINALLY ORDERED that  Defendant Michael T. Gluk's Motion to Dismiss [#13] is DENIED.

SIGNED this the 13th day of November 2012.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

---

[8]Notably, the Second Circuit held a settlement agreement which  purported to indemnify a CEO and CFO for any liability under § 304 was void because "agreements of private parties cannot frustrate the power of a federal agency to pursue the public's interests in litigation."  *Cohen*, 622 F. 3d at 195.

[9]It also bears noting there is nothing preventing corporate officers and their employers from avoiding this risk by negotiating compensation packages which consist solely of a flat salary.  Such an arrangement would probably be effective to contract around § 304, because the reimbursement is limited to "bonus or other incentive-based or equity-based compensation" and profits from stock sales.  15 U.S.C. § 7243(a)(1–2).